THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DOROTHY A. PIZZI *et al.*, Defendants-Appellants.

First District (5th Division)    Nos. 79-2457, 79-2458 cons.

Opinion filed March 20, 1981.

James J. Doherty, Public Defender, of Chicago (Frances Sowa, Assistant Public Defender, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Kathleen Warnick, and Susan Ruscitti Grussel, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Defendants were charged with conspiring to steal carpeting from Crest Flooring Distributors through a scheme in which Pizzi allegedly manipulated and destroyed Crest's business records so that Johnson could receive merchandise without being billed. (Ill. Rev. Stat. 1977, ch. 38, par. 8—2.) In addition, Pizzi was charged with theft (Ill. Rev. Stat. 1977, ch. 38, par. 16—1(a)(1)) and Johnson was charged with theft by deception (Ill. Rev. Stat. 1977, ch. 38, par. 16—1(b)(1)). After a bench trial, defendants were respectively convicted of theft and theft by deception and each was sentenced to one year probation.

On appeal defendants contend that (1) the State's evidence was not sufficient to prove guilt beyond a reasonable doubt; (2) the trial court committed reversible error by restricting cross-examination of crucial prosecution witnesses; (3) the trial court's finding was based on either misapprehension of the evidence or on information that was not presented at trial; and (4) it was error to convict them of the inchoate offense—conspiracy—in addition to the principal offense: theft.

■■ The fourth issue is easily resolved. Written sentencing orders, signed by the trial judge, state that each defendant was placed on probation "on a charge of Theft Etc." Use of the phrase "etc.," which literally means "and other things," raises the question of whether judgment was also entered on the conspiracy charge. While it is proper to simultaneously prosecute a defendant for both an inchoate offense and the corresponding principal offense, judgment can only be entered for one of the two crimes. (Ill. Ann. Stat., ch. 38, par. 8—5, Committee Comments, at 579 (Smith-Hurd 1972); *People v. Brouilette* (1968), 92 Ill. App. 2d 168, 236 N.E.2d 12.) In this case, the phrase, "Theft Etc." was merely used as shorthand for the particular type of theft offense with which each defendant was charged. The preprinted sentencing orders contain spaces for inserting the numerical designations of the offenses upon which judgment was entered. By number, Pizzi and Johnson are only listed as having been convicted, respectively, of theft by unauthorized control and theft by deception. In this context, it is obvious that the phrase "Theft Etc." is merely an abbreviation for the type of theft offense which is specified with more particularity by number. We therefore conclude that judgment was entered only on the theft charges.

The pertinent facts follow.

The essence of the alleged scheme was that, in March and April 1978, Pizzi, an employee of Crest Flooring Distributors, approved credit, with-

out authorization, for carpeting orders from Bell Plaine Carpeting. Then, "a representative of Bell Plaine Carpeting, owned by Herbert J. Johnson, picked up carpeting [under these orders] knowing that his company had no authorization for credit from Crest * * *." According to the State's theory, Johnson never paid for this property, and as a part of the scheme, Pizzi destroyed or altered records of the transactions.

At the time these crimes allegedly occurred the procedure at Crest was that when a customer ordered merchandise, Pizzi (or one of the two other order department employees) filled out a five-copy order form. A copy of this order was sent to the warehouse so that the merchandise could be prepared for pickup. All credit transactions had to be approved by Allen Kramer, the branch manager, or by the credit manager. If credit was approved, and marked as approved on the work order, the customer could go straight to the warehouse to get the ordered merchandise.

The company kept records of customers who ordered merchandise and of the order numbers for these transactions.

Marshall Gordon, president and sole owner of Crest, regularly saw Johnson picking up merchandise at Crest's warehouse, but Gordon did not see any paid invoices from these sales. As a result, Gordon instructed a warehouse employee to keep a list of Johnson's orders.

Nick Bemont, a Crest warehouse employee, kept the list of orders from Johnson's company. From March 14 to April 19, 1978, Bemont listed 16 orders. Although these were all credit transactions, Bemont did not identify who was listed as having approved credit. Two thirds of the orders were picked up by Johnson. The others were picked up by one of Johnson's employees, though Bemont was unable to say which order was picked up by which individual.

Gordon checked the order numbers from the Bemont list, but he could not find any record that bills had been sent to Bell Plaine for these transactions. For some of these sales, the documents were missing. With others, the records, in Pizzi's handwriting, contained an irregular billing number: the number listed was a repeat of the billing number for a prior sale. Also in evidence was an order form, in Pizzi's handwriting, which stated that carpeting was ordered by Bell Plaine on April 19, 1978, and which had her initials in the space reserved for credit approval. However, the merchandise listed in this order was never picked up.

According to Pizzi, Allen Kramer instructed her to make incorrect entries in the records on occasions when he took the proceeds from cash sales. Beginning in 1976, and on the average of once a month Kramer took money from the cash box. This money supposedly was for Gordon, but Pizzi believed that Kramer was not forwarding the money. She was suspicious because Kramer also took the order forms for these cash sales, and he ordered her to list these sales, in the records, with incorrect billing

numbers. The amount Kramer took in March and April 1978 was $5,000. This amount included the proceeds from sales to Johnson. In addition, Kramer told her that Johnson could have short-term credit. Kramer told her several times that sales to Johnson had to be cash on delivery, but that, if Johnson did not have enough cash when he came to pick up the merchandise, he could pay for it within a day or two.

Kramer admitted that he occasionally picked up cash from the order department, along with the corresponding records, but he gave the money and records to Gordon or the company bookkeeper. He estimated the amount as being more than $1,000, though less than $10,000. Kramer also admitted that he occasionally extended short-term credit to Johnson, but only for the sale of remnants (that is, leftovers near the end of a roll of carpeting). The goods described on the Bemont list were remnants. He denied ever telling Pizzi that Johnson was authorized to have short-term credit.

Gordon admitted that Kramer gave him proceeds from cash sales, but he said he instructed the bookkeeper to list these as personal loans. He could not recall how much cash he received in this manner from January through April of 1978.

On April 20, 1978, Gordon asked Pizzi to explain the irregularities he found in the business records, and he accused her of stealing. She admitted she said something like, "Well I guess that's what you would call it," but she thought Gordon was referring to the incorrect record entries Kramer instructed her to make. She believed that Gordon was accusing her of stealing because she followed Kramer's instructions. However, according to Kramer, "[s]he made a statement that [Johnson] would pay her that which was fair, and he would pay her at home." Kramer asked her why, "And she said that, well, she needed money, and she has grandchildren who have needs." According to Gordon, "[S]he said the work orders would go down to the warehouse. [Johnson] would pick up the carpet. She would get the work orders back, and she would take the work orders home with her, and that Herb Johnson would pay her what he thought it was worth." Gordon also testified that Pizzi said she used the money to buy gifts for her grandchildren and that she would make restitution. Pizzi denied making these other statements.

The defense attorney attempted to question Gordon about an alleged offer to have criminal charges dropped if the defendants would pay several thousand dollars. The trial court sustained an objection to the question on the ground that evidence of settlement offers was inadmissible. Following which an offer of proof was made by the defense attorney that the witness would testify to authorizing his brother to make the offer.

Johnson testified that, in March and April of 1978, he went to Crest 15

to 20 times. He usually paid for merchandise the day after he picked up goods at the warehouse. Either Pizzi or Kramer received the cash for all of these purchases. Some of the goods were remnants, but some of the orders were cut-to-order carpeting. When Johnson first started doing business with Crest, Kramer personally approved short-term credit transactions: that is, payment within a day or two after purchase. After a while, Kramer told Pizzi that such short-term credit could be extended. Also, Johnson denied receiving all the property on the Bemont list.

OPINION

Defendants first contend that the trial judge committed reversible error by prohibiting cross-examination of Gordon about alleged offers to have criminal charges dropped in return for the payment of several thousand dollars. In *People v. Bouderioyni* (1921), 299 Ill. 96, 132 N.E. 501, as in this case, a prosecution witness testified that the defendant made an incriminating statement. The supreme court held that it was reversible error to prohibit the defense from questioning this witness about an offer to have the criminal charges dismissed in return for $200. "[The witness] testified to admissions which he said were made by the plaintiff in error, and his motive and interest were important as tending to affect his credibility as a witness. The evidence was directly contradictory and exceedingly close and the question of the credibility of the various witnesses was of vital importance to a fair decision of the issue." (*Bouderioyni,* at 103. Accord, *People v. Provenzano* (1922), 305 Ill. 493, 137 N.E. 414.) This principle from *Bouderioyni* was more recently applied in *People v. Hughes* (1977), 51 Ill. App. 3d 985, 367 N.E.2d 485, where a vital part of the State's evidence was the credibility of the witness the defense attempted to impeach. In contrast, where the evidence of guilt was "sufficient * * * to the point of being overwhelming," there was no abuse of discretion in refusing to permit the defense to recall a witness to perfect the impeachment authorized by *Bouderioyni. People v. Harris* (1978), 57 Ill. App. 3d 639, 641, 373 N.E.2d 593, *aff'd* (1979), 74 Ill. 2d 472, 386 N.E.2d 60.

Despite these cases, the State argues that (1) the issue was waived; (2) offers of compromise are generally inadmissible; (3) *Bouderioyni* should be distinguished because, in this case, the alleged demand for money can be construed as being merely a desire for restitution; (4) it was proper to restrict cross-examination because one of the State's witnesses testified that there was an offer to make restitution; and (5) that it was within the trial judge's discretion to prohibit the attempted impeachment.

As for the contention that this issue was not raised in the defendants' post-trial motion and should be considered waived, we have examined the motion and we find that this issue was preserved for review by citing,

as error, the court's refusal to permit questioning about the alleged offer to have charges dropped.

The State's reference to the rule that, in civil cases, offers of compromise generally are not admissible as evidence (*Bowman v. Illinois Central R.R. Co.* (1957), 11 Ill. 2d 186, 142 N.E.2d 104, *cert. denied* (1957), 355 U.S. 837, 2 L. Ed. 2d 49, 78 S. Ct. 63) is inappropriate because in criminal cases, such situations are governed by Supreme Court Rule 402(f) (Ill. Rev. Stat. 1979, ch. 110A, par. 402(f)). This rule provides that evidence of plea bargaining is not admissible in criminal prosecutions. However, Rule 402(f) deals with plea negotiations between the defendant and the State: it does not render inadmissible evidence of private "bargaining" by prosecution witnesses.

The State argues that, because *Bouderioyni* involved a sex offense, "the money requested was not related to the charge before the court and could not in any way be construed as restitution." However, evidence that a complainant was "only interested in receiving restitution" was precisely the type of attempted impeachment that was erroneously excluded in *People v. Hughes.* (*Hughes*, at 987.) Evidence that the complainant was motivated by an interest in receiving restitution was held to be relevant impeachment.

The State further argues that the attempted impeachment was improper because the witness the defense attempted to impeach testified that Pizzi offered to make restitution. This argument is unconvincing because it presupposes the veracity of the witness the defense attempted to impeach. The witness' own testimony cannot be used to insulate him from impeachment.

■■■ The State correctly points out that the latitude allowed in the cross-examination of a witness is generally within the discretion of the trial court. (*People v. Peter* (1973), 55 Ill. 2d 443, 303 N.E.2d 398, *cert. denied* (1974), 417 U.S. 920, 41 L. Ed. 2d 225, 94 S. Ct. 2627.) Furthermore, "A reviewing court will not find reversible error where cross-examination might have been unduly restricted 'unless there was a clear abuse of this discretion, resulting in manifest prejudice.' " (*People v. Robinson* (1978), 67 Ill. App. 3d 539, 547, 384 N.E.2d 962.) Nevertheless, the widest latitude should be allowed to the defendant for the purpose of establishing bias, motive, or interest on the part of a prosecution witness. (*People v. Mason* (1963), 28 Ill. 2d 396, 192 N.E.2d 835.) Such wide latitude should be allowed because, "The right of a defendant to confront the witnesses against him, protected by both the United States and Illinois constitutions, includes the right to an effective cross-examination." (*People v. Garrett* (1976), 44 Ill. App. 3d 429, 437, 358 N.E.2d 364.) Consequently, the discretion to restrict cross-examination is not unlimited. The question for us is whether this discretion was abused. "Abuse of discretion does not

mean only the decision of a case by whim or caprice, arbitrarily or from a bad motive [citation], but it also means that the discretion has not been justly and properly exercised under the circumstances of the case." (*People v. Pfanschmidt* (1914), 262 Ill. 411, 441, 104 N.E. 804.) We conclude that, in this case, it was an abuse of discretion to prohibit impeachment which the supreme court has held to be proper. Hence, we must determine whether there was manifest prejudice, or whether the error was harmless. Closely related to this question is the issue of whether the evidence was sufficient to prove guilt beyond a reasonable doubt.

The State conceded, at trial and at argument on appeal, that Pizzi's alleged statement cannot be used against Johnson.

> "No man [or woman] can confess to a crime for anyone but himself. (*People v. Rupert*, 316 Ill. 38.) Because of this simple and just rule the law is well settled that confessions or admissions of a co-defendant, or those of a witness against an accused, are not admissible in evidence against such accused unless made in his presence and assented to by him." *People v. Tunstall* (1959), 17 Ill. 2d 160, 166, 161 N.E.2d 300.

Since testimony about Pizzi's statement cannot be used against Johnson, the only evidence of his guilt is circumstantial. "When a conviction rests upon circumstantial evidence only, every reasonable hypothesis of innocence must be excluded." *People v. Dorris* (1980), 90 Ill. App. 3d 707, 709, 413 N.E.2d 441, 442.

The circumstances upon which the case against Johnson rests are not sufficient to prove guilt beyond a reasonable doubt. The State's evidence does not exclude the reasonable conclusion that Johnson paid a Crest employee, in the ordinary course of business, for all the merchandise he received. Furthermore, Bemont testified that the transactions he listed were credit sales, but he did not say who was listed as approving credit. Since the credit manager did not testify, it is impossible to determine whether he approved credit for Bell Plaine purchases. So, even if Johnson still owed for merchandise picked up by him or his employee, the evidence does not exclude the reasonable conclusion that Johnson is merely an ordinary debtor in a credit transaction. The fact that records of Johnson's transactions with Crest are missing, or were doctored, is not proof that Johnson was in any way connected with these suspicious circumstances. Based on these reasons, we hold that there is a reasonable doubt concerning Johnson's guilt; we therefore reverse his conviction.

The sufficiency of the case against Pizzi stands or falls based on the credibility of Kramer and Gordon. Their testimony about Pizzi's alleged statement was a crucial part of the State's case. Though the State's evidence is sufficient to sustain a conviction, the case against her is not overwhelming. Without the testimony of Kramer and Gordon about their

conversations with Pizzi, there would be a reasonable doubt about her guilt. As in *Bouderioyni*, this is a close case which turns on a determination of the credibility of the witnesses. The fact that two witnesses for the State testified about Pizzi's alleged admissions does not make the evidence overwhelming. In *People v. Hughes*, the complainant's testimony was corroborated by six prosecution witnesses, and was contradicted only by the defendant. Nonetheless, the court concluded that the case was close and it was reversible error to prohibit the attempted cross-examination of the complainant. Since the evidence in the present case is close, and the defense was erroneously prohibited from presenting relevant impeachment of crucial prosecution witnesses, we cannot say that this error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) Because of our resolution of this case, we need not consider the contention that the trial court either relied on evidence outside the record or was mistaken about what the evidence was. For the foregoing reasons, the conviction of Johnson is reversed and the conviction of Pizzi is reversed and remanded.

Reversed in part; reversed and remanded in part.

SULLIVAN, P. J., and MEJDA, J., concur.