THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDREW MacFARLAND, Defendant-Appellant,

First District (3rd Division)   No. 1—86—2827

Opinion filed March 31, 1992.

Randolph N. Stone, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Carol L. Gaines, and Nicholas C. Giordano, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

After a joint bench trial with codefendant, defendant Andrew MacFarland was convicted of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)) and sentenced to 35 years' imprisonment. On appeal, defendant asserts that (1) his sixth and fourteenth amendment rights were violated by the admission and use, over objection, of his codefendant's statement against him where the codefendant did not testify and was not subject to cross-examination; and (2) he was arrested without probable cause where the basis of the arrest was that defendant and codefendant gave conflicting stories regarding their whereabouts at the time of the murder. We reverse. We find that the trial court's admission and use of the codefendant's statement against him was prejudicial error in a bench trial.

Katherine Adala was murdered in her second-floor apartment on the night of May 3, 1985. During the course of interviewing all the building's residents, police questioned defendant and codefendant on May 9, 1985.

At the hearing to quash the arrest and suppress the statement, defendant testified that he and codefendant were sitting in their apartment around 3:30 p.m. when Detectives John Fitzsimmons and Lawrence Thezan walked in without knocking and asked them to come to the police station for questioning. Defendant testified that the police officers neither identified themselves nor had an arrest warrant. When defendant refused to go, he was arrested for murder, handcuffed, and taken to the police station. There, the police officers handcuffed him to a ring on the wall, took his shoes, and interrogated him.

Defendant stated that he was questioned intermittently for 8 to 12 hours, and was awake and handcuffed the entire time. Defendant further testified that Detective Fitzsimmons told him three or four times that the codefendant had signed a statement against him, that it was in his best interest to sign a statement to defend himself, that they knew that he did not do it, that they knew about his record, that they knew about the codefendant's previous conviction for the same offense, and that he would be free to go if he made a statement. After he was given *Miranda* warnings, defendant asked for a public defender, but was told that he could not see one until Monday since they did not work during the weekend. The detectives continued to question defendant.

Defendant further testified that after the assistant State's Attorney gave him the *Miranda* warnings, he asked for a public defender

and was again told no one was available until Monday morning. When defendant told the assistant State's Attorney that the police officers kept telling him that he would be free to go if he signed a statement, the assistant State's Attorney responded that it was in his best interest to do what the police said and to sign the statement. The assistant State's Attorney also told defendant that the codefendant had signed a statement against him, and it was in his best interest to sign a statement defending himself. Defendant stated that he was treated fairly by the police officers and was then given a sandwich and some water. Answering the assistant State's Attorney's questions, defendant gave a court-reported statement. He read it, made corrections, and signed it.

Defendant further testified that he did not know of the murder at the time of questioning, did not know Ms. Adala, and had lived in the building approximately one month at the time of his arrest. Defendant was 19 years old at the time of the arrest, was a high school graduate, received a general discharge from the Army two months before the murder, and had never before been arrested. He further stated that it was the first time he had ever been in a police station while charged with a crime.

Detective John Fitzsimmons testified that he and his partner, Detective Lawrence Thezan, were assigned to the case after other police officers had interviewed the building's residents. On May 8, 1985, the detectives interviewed Marshall Lyons and his brother, John Ward, who stated that they were watching the 8 o'clock movie in their apartment, with the door open, when Ms. Adala came to the door and asked if they wanted a drink. When they said they did, she left and came back with a bottle of liquor. Both Lyons and Ward had a drink from the bottle. At that time, defendant and codefendant stood by the doorway, had a drink, and left, walking east down the hallway. Neither Lyons nor Ward saw Ms. Adala after that. Fitzsimmons stated that both Ms. Adala's apartment and defendant's apartment were east of Lyons and Ward's apartment.

Fitzsimmons further testified that Lyons gave them defendant's and codefendant's names, descriptions, and apartment number. The detectives went to that apartment on the evening of May 8, 1985, but were told that both defendant and codefendant were at work at the Tribune Company and would be home the next day. Fitzsimmons stated that they went to defendant's apartment the next day around 5 p.m. Since the apartment door was open, Fitzsimmons could see defendant and codefendant sitting in the apartment. The police officers knocked on the door, identified themselves, and showed their

stars. Standing outside the apartment door, Fitzsimmons stated, he asked defendant if he would come for questioning, and defendant agreed. At that time, defendant was not considered a suspect, and was not handcuffed. Arriving at the police station at 6 p.m., defendant and codefendant were put in different interview rooms.

When Fitzsimmons and Thezan questioned defendant at 6 p.m., he stated that he knew about the murder and that he was working at the Tribune during the time Ms. Adala was murdered. Defendant told the detectives that he left for work around 8 or 9 p.m. and worked until 7 a.m. the next morning. The codefendant then told the detectives that he and defendant did not work that night because they arrived too late after being stuck on the el train for two hours. When Fitzsimmons requestioned defendant at 6:30 p.m., telling him the codefendant's version, defendant repeated that he was working that night. Fitzsimmons testified on cross-examination that defendant was arrested after the conflicting statements.

The detectives then went to the crime scene and spoke to the building manager, who stated that Ms. Adala received her public aid check on May 1, 1985. After taking out her rent, he gave Ms. Adala $200 in cash. At 9 p.m., the detectives returned to the police station, gave defendant his *Miranda* warnings and requestioned him. After defendant repeated the same story, Fitzsimmons told defendant that "his buddy had given it up and told us about it," and then asked defendant how much money he received. Fitzsimmons testified that defendant told him that he got $5. After gaining information from defendant and codefendant, the detectives requested an evidence technician and returned to the crime scene, where they found Ms. Adala's apartment window open and radios stacked up.

When the detectives returned to the police station, they contacted the assistant State's Attorney, who interviewed defendant around 12:45 a.m. Fitzsimmons stated that he gave defendant beverages, cigarettes, and food after he gave an oral statement to the assistant State's Attorney. Defendant gave a court-reported statement at 4:44 a.m., made corrections, and signed the statement.

Fitzsimmons testified that defendant did not ask for an attorney or a public defender, did not ask him for an arrest warrant when he was in his apartment, and did not say he could not go the police station because he was going to work. Defendant was not handcuffed until after giving the oral statement around 9 p.m. or 9:30 p.m. He was not handcuffed when interviewed by the assistant State's Attorney, when he made the court-reported statement, or when he read and corrected that statement. Fitzsimmons denied telling defendant that

signing the statement would benefit him or that he would be allowed to leave if he gave a statement. No threats or promises of leniency were made.

Detective Lawrence Thezan gave substantially the same account of the interview with Marshall Lyons. Thezan said that the two men were questioned separately at 6 p.m. Defendant was not handcuffed when he went to the police station or during the first, second, or third interviews. Defendant was given *Miranda* warnings after the detectives spoke with the building manager. Thezan testified that defendant was arrested after he made the statement about the $5. Thezan testified that defendant did not ask for an attorney or about an arrest warrant. Thezan denied ever telling defendant that he would go free if he made a statement.

Assistant State's Attorney John Hynes testified that he interviewed defendant from 12:45 a.m. to 1:15 a.m. on May 10, 1985. After interviewing the codefendant, he again interviewed defendant about the discrepancies in their two versions. Hynes further testified that defendant got food and beverage, then made a court reported statement, which he read and signed. Hynes stated that he did not tell defendant he would go free if he made a statement, that defendant did not request an attorney or public defender, and that no promises of leniency were made.

Concluding that the arrest was justified, the trial court denied the motion to quash arrest. Stating that the totality of the circumstances indicated that all statements were made freely and voluntarily after proper *Miranda* rights were given, the trial court also denied the motion to suppress the statement. The trial court found that defendant was not initially a suspect and that the arrest occurred after the detectives went to the crime scene and had it reprocessed by an evidence technician.

At the simultaneous bench trial, Detective Fitzsimmons' testimony was essentially the same as his testimony during the motion hearing. In addition, he stated that defendant made an oral statement after being given his *Miranda* rights, stating that he and the codefendant were at the apartment where Ms. Adala was; there was a short conversation; and one of them took a drink from Ms. Adala's bottle. Ms. Adala then left and went into her apartment. Looking for money, defendant and codefendant went to Ms. Adala's apartment and knocked on the door. When Ms. Adala answered, they pushed the door in, and she fell on the bed. Both men went into the apartment.

Fitzsimmons then stated that one defendant said they both had sex or attempted to have sex with Ms. Adala, but the other defendant

stated that only one of them had sex with her, that they located some money, and began to pile up the radios. They struck Ms. Adala with a pipe wrench several times in the head, once in the throat, and a couple of times in the chest. One of the defendants took a broom handle and placed it on top of Ms. Adala's throat, stood on the handle, and began jumping and rocking on it because she would not die. Before leaving through the window, they placed a wedge that they located in the apartment on top of a small burner to start a fire. They then ran out the window, taking the money and the weapon. Defendant stated that the codefendant had stabbed and beaten Ms. Adala, while the codefendant blamed the violence on defendant. Fitzsimmons also stated that Ms. Adala's apartment door had been locked; it was opened by the building manager; and that defendant denied in his oral statements that he had sexual intercourse with Ms. Adala.

John Ward testified that he and his brother, Marshall Lyons, were watching the 8 o'clock movie in their apartment with the door open. He saw Ms. Adala, defendant, and codefendant in the hall. When Ward asked Ms. Adala for a drink, she gave him a drink and walked down the hall. Then Ward saw defendant and codefendant walk down the hall toward their apartment.

There were stipulations that the cause of death was multiple stab wounds and a blunt injury to the head; there was semen present in the vagina; and there were no sperm present in the semen. Defendant's and codefendant's statements were then admitted into evidence. Over the defense counsel's objection, the trial court allowed the codefendant's statement to be admitted as evidence against defendant.

In his statement, defendant responded to the assistant State's Attorney's questions. Defendant stated that he saw Ms. Adala in the second-floor hallway during the evening of May 3, 1985. She was there with the codefendant and two other men. Someone offered defendant and codefendant a drink, but they both refused. Ms. Adala then left and went to her apartment. As defendant and codefendant went back to their apartment, defendant asked the codefendant, "I wonder if she's got any money?" and the codefendant responded, "I don't know, we have to find out or whatever."

Defendant's statement also said that the two men then went to Ms. Adala's apartment and knocked on the door, which was partially open. When she came to the door, the codefendant forced himself in and said, "Hi, baby, how's it going?" He then told her that he wanted to make love to her. Defendant looked around the apartment for money or anything to take, and picked up $5 and some change from the table. At that time, the codefendant was kissing Ms. Adala, who

was resisting. The codefendant then took off both her pants and his pants, and put his penis in her vagina while he was on top of her. Ms. Adala was attempting to push him away, but she did not have the strength. The codefendant then hit Ms. Adala four or five times on the side of her face and head with an open hand, grabbed a dish towel, and tried to strangle her. Ms. Adala was "grabbing the towel, kicking, trying to get it out."

The codefendant then hit Ms. Adala with a pipe wrench four or five times on top of her skull. Earlier in the day, defendant had seen a similar pipe wrench in his apartment. There was a continuous flow of blood, and her eyes were still open. Saying "die, bitch, die," the codefendant grabbed a piece of wood, like a broom handle, placed it across her throat, put his foot on each end, and continuously jumped up and down on her throat. Ms. Adala was kicking violently. The codefendant then grabbed an 8- to 10-inch long, serrated bread knife that was on the counter within arm's reach of the bed, and stabbed her in the throat and chest five times. Ms. Adala was still kicking, but appeared to be losing strength.

The codefendant then got off Ms. Adala and watched her for three or four minutes, waiting to make sure she was dead. She looked like she was bleeding to death. Defendant then took a scotch bottle and a pack of chewing gum. Going through the pockets of a green jacket and taking some money, the codefendant gave defendant $5 or $10. They both then left through the window.

The codefendant also answered the assistant State's Attorney's questions in his statement stating that he saw Ms. Adala on the night of May 3, 1985, speaking to two men in apartment 207. The codefendant walked up and spoke to the two men, but did not know Ms. Adala. Defendant did not arrive until after Ms. Adala returned with a bottle for the two men. As they were sitting there, Ms. Adala offered both defendant and codefendant a drink, but they both refused. Defendant and codefendant then went toward their apartment, and Ms. Adala went toward her apartment.

Walking back to their apartment, defendant asked the codefendant, "[d]o you think this lady have [sic] any money?" The codefendant responded "I don't know but we can find out" and knocked on Ms. Adala's door. She opened the door wide, and the codefendant pushed her to the bed. Defendant closed and locked the door, then "pushed up a white clock and a brown AM-FM clock radio." The codefendant told him that he did not want to take that stuff because it was petty.

Defendant then said "well, let's fuck the lady." When the codefendant pulled her pants halfway down, defendant said he was going

to go first. The codefendant said "no, let me go first," and pulled his pants halfway to his knees. The codefendant then stated that his penis touched her vagina, but wouldn't go in. She did not resist, but lay there pushing his shoulders up. Then, defendant pulled his pants halfway down and got on top of her. She was also pushing him away. When defendant got up, he said that he could not climax.

The codefendant then told defendant that they had to do something with Ms. Adala so that she could not tell the police. When defendant suggested tying her up, the codefendant said that was not good enough. Defendant then took "the crowbar—I mean the thing, the wrench" from his back pocket, and hit her six times on the top of her head. There was blood all over her head. Complaining that she was not yet knocked out or dead, defendant asked for something with which to choke her. The codefendant picked up a broken broomstick and gave it to defendant, who put the broom on her neck and started choking her. He stood with each foot on either side of her neck and bounced three times. Ms. Adala was "jibbering, pissed all over herself." Her eyes were going up in her head. Defendant said "this bitch ain't dead yet," then told the codefendant to "look around for something."

The codefendant then picked up a butcher knife from the cabinet by the door, grabbed it by the blade, and tossed it to defendant, who grabbed it by its wooden handle and stabbed Ms. Adala in the neck. The codefendant then turned off the light so that no one in the next building would see them, but he could hear the knife going into her. They then turned on the light and looked for money, but did not find any. After the codefendant turned over a hot plate on top of a brown wig, they took the knife and pipe wrench. In a green coat, defendant found a wallet with $40 and some change. He gave the codefendant $20. Defendant took the other $20 and threw the change at Ms. Adala, who was still moaning. They then left through the window.

Closing arguments were waived. Without any specific findings, the trial court found both defendants guilty of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)), but not guilty of home invasion (Ill. Rev. Stat. 1983, ch. 38, par. 12—11(a)) and aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)).

On appeal, defendant asserts that his statement must be suppressed because it was a product of an illegal detention and police deception. He first contends that he was arrested at the police station without probable cause since the only evidence against him was that he and the codefendant gave conflicting versions of their whereabouts at the time of the murder.

Defendant concedes that the police acted properly in asking him and the codefendant to go to the police station for questioning since they believed that they were with Ms. Adala on the evening of her murder. While the conflicting stories by defendant and codefendant warranted further investigation and may have focused suspicion on one of them, defendant argues, it was not probable cause to arrest him. In determining whether an arrest took place, the question is whether a reasonable, innocent person in the defendant's situation would have considered himself arrested or free to go. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 165.) Probable cause for arrest exists when facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense. (*People v. Creach* (1980), 79 Ill. 2d 96, 101.) Although mere suspicion that the person arrested has committed the offense is an insufficient basis for arrest, evidence sufficient to convict is not required. *Reynolds*, 94 Ill. 2d at 166.

Defendant relies on *Reynolds*, where the Illinois Supreme Court ruled that the police lacked probable cause to arrest even though the suspects gave differing responses as to where they got the equipment. (94 Ill. 2d at 166.) When the police stopped a trailer for a taillight violation, they observed suspicious looking boxes in the rear of the trailer. The police asked the occupants about the boxes, but were given vague and conflicting responses. After a consensual search, the police arrested the defendants. The supreme court ruled that there was no probable cause to arrest because there was no known criminal activity at the time of the arrest even though the circumstances were suspicious. (*Reynolds*, 94 Ill. 2d at 166.) In contrast, Fitzsimmons and Thezan knew of Ms. Adala's murder when they arrested defendant. They also knew that defendant was with Ms. Adala shortly before she was murdered even though defendant told them that he was at work that night.

Defendant also cites *People v. Williams* (1977), 53 Ill. App. 3d 266, 272, where the court held that there was no probable cause to arrest even though the defendant told the police during questioning that he had been told that another person committed the murder during an abortive robbery attempt. The court stated that the defendant did not have such intimate knowledge of crime details that suspicion would be focused on him. *Williams*, 53 Ill. App. 3d at 272.

In response, the State relies on *Creach*, where the Illinois Supreme Court ruled that there was sufficient evidence for the trial court to rule that probable cause to arrest existed. At the time that

the police officers took the defendant into custody, they knew that the defendant was living with the victim, that she most likely had been killed sometime after midnight, that the defendant had last seen her just 5½ hours prior to the time the body was discovered, and that he had unexplainedly left for Ohio in the victim's car. *Creach,* 79 Ill. 2d at 102.

■ In this case, the trial court found that the arrest took place after the officers went back to the crime scene, the scene had been reprocessed by the evidence technician, the police officers gave defendant his *Miranda* warnings, and defendant told them he received $5. Where testimonial evidence is conflicting, it is the role of the trial judge to determine credibility. (*People v. Jacquith* (1984), 129 Ill. App. 3d 107, 113.) Since the trial court's finding that probable cause to arrest existed was not manifestly erroneous (*Reynolds,* 94 Ill. 2d at 165), it is affirmed.

Defendant also argues that his statement was involuntary because he was 19 years old, had never before been arrested, and that deliberate false statements were made about the codefendant's allegations against him. (*People v. Bridges* (1990), 198 Ill. App. 3d 534, 538-39.) Voluntariness of a confession is determined by examining the totality of the circumstances (*People v. Prim* (1972), 53 Ill. 2d 62, 70), with consideration given to both the individual characteristics of the accused and the details of the interrogation. (*Bridges,* 198 Ill. App. 3d at 538.) Relevant factors of the individual characteristics include the defendant's age, education, mental capacity (*People v. Martin* (1984), 102 Ill. 2d 412, 427), emotional characteristics, previous experience with the criminal system, and whether the confession was induced by police deception. (*Bridges,* 198 Ill. App. 3d at 538.) Relevant factors of the interrogation include the duration of the questioning (*Martin,* 102 Ill. 2d at 427), whether defendant was subjected to physical punishment (*Bridges,* 198 Ill. App. 3d at 538), offers of leniency (*People v. Ruegger* (1975), 32 Ill. App. 3d 765, 769), other offers or promises that induce the confession (*People v. Koesterer* (1976), 44 Ill. App. 3d 468, 478), falsely aroused sympathy (*People v. Tanser* (1979), 75 Ill. App. 3d 482, 485), prior refusals to answer questions (*Ruegger,* 32 Ill. App. 3d at 770), and whether defendant was informed of his constitutional rights (*Martin,* 102 Ill. 2d at 427).

■ A trial court's finding that a confession was voluntary will not be overturned unless it is against the manifest weight of the evidence. (*Prim,* 53 Ill. 2d at 70.) The totality of the circumstances surrounding the statement indicates that the trial court's denial of the

motion to suppress defendant's statement was not against the manifest weight of the evidence. Therefore, it is affirmed.

Defendant next asserts that his rights under the United States Constitution's sixth and fourteenth amendments were violated by the admission and use, over objection, of his codefendant's out-of-court statement against him where the codefendant did not testify and was not subjected to cross-examination. The State contends that the issue was waived since it was not raised in defendant's motion for a new trial. Immediately following the trial court's finding of guilty, the defense counsel asked the court if he could make an oral motion for a new trial. Without giving counsel the opportunity to make a formal motion or to argue the merits of the motion, the trial court responded that the motion was denied. When the assistant State's Attorney objected to the motion for a new trial being made orally, the trial judge ignored the objection and proceeded with the sentencing hearing. There had been a timely objection to the use of codefendant's statement made at trial a few minutes before the oral motion for a new trial was denied.

While the failure of the defendant to raise an issue in a written motion for a new trial generally constitutes a waiver of that issue, the plain error rule is applied where substantial rights are affected or where the evidence is closely balanced. (*People v. Pickett* (1973), 54 Ill. 2d 280, 283.) Since the right of confrontation is a substantial right, this issue is reviewed under the plain error rule.

Defendant's argument is clear and simple. He asserts that the codefendant's out-of-court statement implicating him is inadmissible against him because it is incompetent hearsay evidence. Defendant further claims that he is constitutionally entitled to a new trial since the statement's admission violated his sixth and fourteenth amendment right to confrontation. Finally, defendant asserts that the error was not harmless beyond a reasonable doubt since the only evidence that he committed any violence against the victim was the codefendant's statement and his own custodial confession, which he contends was the product of an illegal arrest and police coercion.

Contending that the codefendant's statement was not admitted against the defendant, the State responds by arguing that *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, should not be extended to bench trials. The court in *Bruton* ruled that limiting instructions must be given to the jury in joint trials when the codefendant's confession is admitted only against the codefendant. (391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.) An examination of

this record, however, reveals that the codefendant's statement was admitted against defendant.

The confrontation clause of the sixth and fourteenth amendments guarantees the right of a criminal defendant to be confronted with the witnesses against him, including the right to cross-examine those witnesses. (*Cruz v. New York* (1987), 481 U.S. 186, 189, 95 L. Ed. 2d 162, 169, 107 S. Ct. 1714, 1717.) These rights are essential and fundamental requirements for a constitutionally fair trial. (*Lee v. Illinois* (1986), 476 U.S. 530, 540, 90 L. Ed. 2d 514, 525, 106 S. Ct. 2056, 2062.) In a joint trial, the codefendant's pretrial confession implicating the defendant is not admissible against the defendant unless the codefendant testifies and is subject to full and effective cross-examination. (*Cruz*, 481 U.S. at 190, 95 L. Ed. 2d at 169, 107 S. Ct. at 1717; *People v. Collins* (1989), 184 Ill. App. 3d 321, 327.) Traditionally, a codefendant's arrest statement, which is hearsay, has been viewed with special suspicion. (*Lee*, 476 U.S. at 541, 90 L. Ed. 2d at 526, 106 S. Ct. at 2062.) Because of a strong motivation to implicate the defendant and to exonerate himself, a codefendant's statement implicating the defendant is inherently unreliable. (*Lee*, 476 U.S. at 546, 90 L. Ed. 2d at 530, 106 S. Ct. at 2065.) Since the statement is presumptively suspect, it must be subject to the scrutiny of cross-examination. *Lee*, 476 U.S. at 541, 90 L. Ed. 2d at 526, 106 S. Ct. at 2062.

A codefendant's confession may be admissible without confrontation, however, if it has sufficient independent indicia of reliability (*Collins*, 184 Ill. App. 3d at 329) that rebuts its unreliability. (*Ohio v. Roberts* (1980), 448 U.S. 56, 66, 65 L. Ed. 2d 597, 608, 100 S. Ct. 2531, 2539.) Whether the codefendant's confession interlocks with the defendant's confession relates to its reliability (*Cruz*, 481 U.S. at 192, 95 L. Ed. 2d at 171, 107 S. Ct. at 1719), but is not necessarily reliable simply because some of the facts it contains interlock with the facts in the defendant's confession. (*Lee*, 476 U.S. at 545, 90 L. Ed. 2d at 529, 106 S. Ct. at 2064.) When codefendants' confessions are identical in all material respects, the likelihood that they are accurate is significantly increased. (*Cruz*, 481 U.S. at 192, 95 L. Ed. 2d at 171, 107 S. Ct. at 1719.) When the discrepancies between the statements are not insignificant, however, the codefendant's confession is not admissible. (*Lee*, 476 U.S. at 545, 90 L. Ed. 2d at 529, 106 S. Ct. at 2064.) A finding of a confession's voluntariness has no relevance to whether the codefendant's confession is also free from any desire, motive, or impulse to lie. *Lee*, 476 U.S. at 544, 90 L. Ed. 2d at 528, 106 S. Ct. at 2064.

To assure a fair trial, Illinois evidentiary law also prohibits a codefendant's statement from being admitted against the defendant unless there is some other exception to the hearsay rule. (*People v. Duncan* (1988), 124 Ill. 2d 400, 414.) Defendant relies on *Lee*, which reversed the defendant's conviction because the trial court erroneously relied on the codefendant's custodial confession as substantive evidence against the defendant. The court concluded that the codefendant's statement, as the confession of an accomplice, was presumptively unreliable and that it did not bear sufficient independent indicia of reliability to overcome that weighty presumption. (*Lee*, 476 U.S. at 546, 90 L. Ed. 2d at 530, 106 S. Ct. at 2065.) Although the codefendant's confession interlocked with the defendant's statement in several respects, the court stated that there were significant differences regarding the roles played by the two defendants in one murder and the question of premeditation in the other murder. *Lee*, 476 U.S. at 546, 90 L. Ed. 2d at 529-30, 106 S. Ct. at 2065.

Defendant also cites *Collins*, where the codefendants' confessions described substantially similar actions although they differed regarding which defendant performed the alleged rape on the victim and which defendant searched the victim's possessions. (184 Ill. App. 3d at 328.) In a supplemental opinion, this court wrote that the statements of the nontestifying codefendants lacked sufficient independent indicia of reliability because each defendant "pointed the finger" at his codefendants, and that the circumstances surrounding the taking of the statements showed that the defendants provided oral statements to the police upon being questioned, that each defendant knew the others were being held and questioned by police, and there was limited corroborating evidence. *Collins*, 184 Ill. App. 3d at 337-38.

The State misses the point of defendant's argument by concentrating on the *Bruton* rule. Instead of addressing defendant's arguments, the State argues against extending the *Bruton* rule to bench trials. Defendant, however, makes no such argument in his brief. In fact, he never even mentions *Bruton*. Therefore, the State misplaces its reliance on cases that analyze limiting instructions in a jury trial. See *Bruton*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620; *Cruz*, 481 U.S. 186, 95 L. Ed. 2d 162, 107 S. Ct. 1714; *Lee*, 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056; *Dutton v. Evans* (1970), 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210; *Collins*, 184 Ill. App. 3d 321; *People v. McNeal* (1977), 56 Ill. App. 3d 132; *People v. Vinson* (1977), 49 Ill. App. 3d 602.

While it is true, as the State argues, that a judge is presumed to know the law and only considers competent evidence (*People v.*

*Harris* (1974), 57 Ill. 2d 228, 231), that presumption has been rebutted in this case. The trial court improperly admitted the nontestifying codefendant's statement when it overruled the defense counsel's objection to that statement being admitted against defendant.

Furthermore, the codefendant's statement did not have sufficient independent indicia of reliability to be admitted. The statement was given in response to the questions of police, who had already interrogated defendant; the statement was not tested in any manner by contemporaneous cross-examination by counsel or its equivalent; and the statement, though court-reported, was unsworn. (*Lee*, 476 U.S. at 544, 90 L. Ed. 2d at 528, 106 S. Ct. at 2064.) While the statements interlocked in several parts, they contradicted each other in significant ways, including who was responsible for the acts of violence. The defendant's statement was that the codefendant committed the acts of violence, while the codefendant's statement pointed out that defendant committed the acts of violence. Also, the codefendant's statement included information regarding the locked apartment door, piled up radios, and a wig being placed on the hotplate, whereas defendant's statement made no mention of those facts.

Finally, the State argues that even if the trial court erroneously considered the codefendant's statement against defendant, the error was harmless. When a trial error affects a Federal constitutional right, as here, it is reversible error unless it is harmless beyond a reasonable doubt. (*People v. Owens* (1984), 102 Ill. 2d 88, 104; *People v. Freeman* (1981), 100 Ill. App. 3d 478, 481.) In determining whether the error was harmless, the sufficiency of the evidence proving guilt beyond a reasonable doubt must be considered. (*People v. Pizzi* (1981), 94 Ill. App. 3d 415, 421.) If the evidence of the defendant's guilt is uncontroverted and/or so overwhelming that the constitutional violation resulting from its admission at trial did not have an effect on the verdict, then the error is harmless beyond a reasonable doubt. *People v. Dixon* (1988), 169 Ill. App. 3d 959, 978.

The State contends that the evidence against defendant was overwhelming. In support of that contention, the State cites the testimony of John Ward and Marshall Lyons as well as defendant's and codefendant's custodial statements. First, in addressing the issue of whether the error is harmless beyond a reasonable doubt, we must consider the evidence without the inadmissible codefendant's statement. At most, the testimonies of Marshall Lyons and John Ward place defendant, codefendant, and Ms. Adala on the same floor on the evening of the murder. Lyons and Ward saw Ms. Adala walk toward

her apartment and saw defendant and codefendant walk toward their apartment. Both apartments were in the same direction.

■ We are then left with the physical evidence and defendant's statement as the only competent evidence. In his statement, defendant does not admit using any violence against Ms. Adala. Defendant admits going to Ms. Adala's apartment with the codefendant to see if she had any money. Defendant also admits being present when the codefendant raped and beat Ms. Adala with his open hand and a pipe wrench. Defendant stated that he saw the codefendant try to strangle Ms. Adala with a dish towel and broomstick, then stab her with a butcher knife. Defendant, however, does not admit taking part in the violence. He admits leaving through the window after taking a bottle of scotch, a pack of chewing gum, and about $5.

Defendant's statement contradicts the codefendant's statement in significant ways, and there are discrepancies between defendant's statement and the physical evidence. Defendant's statement mentions nothing about radios stacked in the apartment, the locked apartment door, or the wig on the hotplate, which caused the fire alarm in Ms. Adala's apartment to sound.

The State also contends that any error in admitting the codefendant's statement is harmless because defendant's statement alone would make him guilty of murder under the theory of accountability. For a conviction on the accountability theory, the State must establish beyond a reasonable doubt that: (1) the defendant solicited, ordered, abetted, agreed, or attempted to aid another in the planning or commission of the crime; (2) the defendant's participation took place before or during the commission of the crime; and (3) the defendant had the concurrent, specific intent to promote or facilitate the commission of the crime. (*People v. Deatherage* (1984), 122 Ill. App. 3d 620, 624; Ill. Rev. Stat. 1987, ch. 38, par. 5—2.) Mere presence at the scene of the crime and knowledge that a crime is being committed is insufficient to establish guilt by accountability. (*People v. Evans* (1981), 87 Ill. 2d 77.) Nevertheless, circumstances showing there was a common design to commit a crime (*People v. Tate* (1976), 63 Ill. 2d 105, 109), or presence at the scene of the crime in addition to acts after its commission may be enough. *People v. McBounds* (1989), 182 Ill. App. 3d 1002, 1016.

A defendant cannot be convicted based on a confession alone. (*People v. Neal* (1985), 111 Ill. 2d 180, 194; *Collins*, 184 Ill. App. 3d at 333.) There must be some independent evidence, exclusive of the confession, tending to show that a crime occurred and that defendant committed it. (*Neal*, 111 Ill. 2d at 194.) Here, the evidence corroborat-

ing the facts contained in defendant's confession was not so overwhelming that the admission of the nontestifying codefendant's statement against defendant was harmless beyond a reasonable doubt.

Based on the foregoing, the circuit court's judgment denying defendant's motions to quash arrest and suppress his statement is affirmed. Further, defendant's conviction is reversed and remanded for a new trial. At the new trial, the codefendant's statement is not to be admitted against defendant.

Affirmed in part; reversed and remanded in part.

GREIMAN, P.J., and TULLY,* J., concur.

---

*Justice White heard oral arguments prior to his retirement. Justice Tully was substituted, read the briefs and the record and concurred with the decision.