2021 IL App (1st) 180112-U

No. 1-18-0112

Second Division
May 11, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14 CR 16780 (02) |
| SAKHEE HARDY JOHNSON, | ) ) | Honorable Maura Slattery Boyle |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court is affirmed where (1) defendant's sixth amendment right to confrontation was not violated; (2) trial counsel was not ineffective for failing to suppress statements of codefendant or for failing to inquire further as to a juror's bias; and (3) the trial court did not commit plain error in failing to comply with Illinois Supreme Court Rule 431(b). However, we vacate the trial court's sentence and remand for resentencing where the court considered improper factors or evidence not in the record.

¶ 2 Following a jury trial, defendant-appellant, Sakhee Hardy Johnson was convicted of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) on a theory of accountability. The trial court sentenced defendant to 45 years' imprisonment for first-degree murder, plus a 15-year firearm enhancement, for a total of 60 years in prison.[1] On appeal, defendant argues that this court should reverse his conviction and remand for a new trial because (1) his sixth amendment right to confrontation and his right to a fair trial were violated when the trial court permitted the jury to hear two non-testifying codefendants implicate him to the police; (2) defense counsel was ineffective for not moving to suppress the conversation between him and codefendant Michael Mays which was recorded in violation of the laws against eavesdropping; (3) the trial court violated Illinois Supreme Court Rule 431(b) by failing to ask if the jurors understood and accepted that defendant had no obligation to testify, and that his failure to testify could not be held against him; and (4) defense counsel was ineffective for allowing a juror, who admitted during *voir dire* that there was something that would prevent him from being a fair and impartial juror, from sitting on the jury without further investigation. Defendant further requests that this court remand for a new sentencing hearing. In his opening brief, he argues that his 60-year sentence constitutes a *de facto* life sentence that violates the eighth amendment and proportionate penalties clause. Alternatively, defendant requests this court remand for resentencing because counsel was ineffective for not developing and presenting a disparate sentencing argument. For the following reasons, we affirm in part, vacate in part, and remand for resentencing.

---

[1]Defendant was sentenced to a 15-year firearm enhancement pursuant to section 5-8-1(a)(1)(d)(i) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2014)), which provides for a 15-year sentence enhancement for individuals who commit first-degree murder "while armed with a firearm." See *People v. Rodriquez*, 229 Ill. 2d 285, 295 (2008) (holding that the 15-year sentence enhancement also applies to an unarmed offender found guilty of first-degree murder under the theory of accountability.).

¶ 3                                    I. BACKGROUND

¶ 4       On September 26, 2013, Leonard Anderson was shot twice in an alley behind a recording studio located at 70th Street and Stony Island Avenue in Chicago, Illinois. The investigation stalled until August 2014 when Chicago police arrested and later charged Mays, Meiko Buchanan, and defendant. Defendant was charged by indictment with three counts of first-degree murder (720 ILCS 5/9-1(a)(1-3) (West 2014)) and two counts of mob action (720 ILCS 5/25-1(a)(1), (b)(3) (West 2014)) in connection with the shooting death of Anderson. The case proceeded to jury trial.[2]

¶ 5                                  A. Motions *in Limine*

¶ 6       Prior to trial, defendant filed motions *in limine* to redact or exclude portions of his electronically recorded interview (ERI) that (1) discussed an unrelated firearm charge; and (2) referred to incriminating statements from codefendants Mays and Buchanan. The State agreed to redact all references to the firearm charge from the ERI. With respect to statements made by codefendants, the State argued that a portion of the ERI referring to discussions with codefendants should be admitted because they were necessary to provide context to defendant's statements. The State proposed presenting selected portions of the ERI at trial and providing a limiting instruction to the jury. After the State provided edited video clips that it intended to present at trial, the court admitted the proffered clips.

¶ 7       The State also filed a motion *in limine* to admit a video of defendant speaking with Mays while he was in a nearby restroom. Defendant argued that the court should exclude the video because it was a "back door" to admit the hearsay evidence which the State had already agreed to

_____

[2]The trial court granted motions to sever trials and defendant opted to be tried by a jury.

redact from the ERI. The court granted the State's motion to admit the video, finding that the video was more probative than prejudicial.

¶ 8                                B. Jury Instructions and *Voir Dire*

¶ 9     Prior to jury selection, the trial court provided preliminary instructions to the jurors. The court advised the jurors that the instructions were "not [their] final [nor their] complete instructions" as "those [would] come after [they] heard all the evidence and the final arguments of the attorneys in this case." The court then instructed the jurors that defendant was presumed innocent of the charges against him, that the presumption remained with him at every stage of the trial, and that it "is not overcome unless *** [they] are convinced beyond a reasonable doubt that the defendant is guilty" after hearing all the evidence. The court noted that the State had the burden of proof and defendant was not required to prove his innocence or present evidence on his own behalf. The court informed the jurors that their role was to be "judges of facts."

¶ 10    The court then admonished the jurors of four principles. The court asked if the jurors understood and accepted that: (1) "a person accused of a crime is presumed to be innocent of the charge against him"; (2) the "presumption stays with the defendant throughout the trial and is not overcome unless from all the evidence [they] believe the State proved his guilt beyond a reasonable doubt"; (3) "defendant does not need to prove his innocence"; and (4) "defendant does not have to present any evidence on his own behalf." After stating each principle, the court instructed the jurors to raise their hand if they did not "understand and accept" the principles. No hands were raised.

¶ 11    The court proceeded to conduct individual *voir dire*. As relevant here, James Carter, a prospective juror, stated that his wife worked as a corporate attorney. He knew other lawyers including a "handful of criminal defense attorneys." When asked whether he "ever talk[ed] with

any of these attorneys in any facet about their work, whether they are in criminal or anything like that," Carter responded "[n]ot about specific cases." When asked if "there [was] anything about [his] acquaintance with any of these attorneys and [his] spouse's profession that would prevent [him] from being fair and impartial here today," Carter responded "Yes." The circuit court then asked Carter if he knew any judges or police officers. Carter replied that he did but that there was nothing about his acquaintance with them that would prevent him from being fair and impartial. Carter further acknowledged that he would "give each witness that testifies the same weight and level of credibility regardless of what they do for a living" and that he would "listen to all the evidence and do so in a fair and impartial manner." Carter was then accepted on the first panel of prospective jurors. The following facts were adduced at trial.

¶ 12                                    C. The State's Case

¶ 13    Dedra Morris testified that her son, Anderson, was a rap artist who performed under the name "L'A. Capone." Morris saw her son at home on the morning of September 26, 2013 and spoke with him again over the phone at around 2 p.m. that day. It was Morris's understanding that Anderson was going to a recording studio located near 70th and Stony Island to work on music. Later that evening, Morris received a call that Anderson had been shot and was undergoing surgery at Northwestern Hospital. She was unable to speak to her son before he passed away.

¶ 14    Detective John Halloran testified that he and his team were assigned to investigate Anderson's shooting on September 26, 2013. The team consisted of his partner Detective John Murray and four other detectives, including Detective Robert Garza, Detective Kristi Battalini,

Detective David Hickey, and Detective Frank Casell. The team also included two "aggravated battery detectives," Detective Barnett and Detective Felton.[3]

¶ 15    Detective Halloran testified that the shooting occurred in an "alley area." He and his team investigated the scene and attempted to speak with people to identify any witnesses, but the case went "cold." Nearly a year later, on August 20, 2014, Detective Halloran started working on the case again when he spoke with Mays at the police station. At some point, Detective Halloran made efforts to locate defendant and found him at his home. On August 21, 2014, defendant was brought to the police station and placed in an interview room equipped with audio and video recording. Detective Halloran did not advise defendant that he was being recorded. He testified that he was not required to do so at the time. Detective Halloran advised defendant of his *Miranda* rights. He and Detective Garza then spoke with defendant for "roughly an hour." Detective Halloran identified defendant in court.

¶ 16    During Detective Halloran's direct examination, the State played a series of video clips for the jury. Our review of the clips shows the following. The first video clip showed that defendant was advised of his *Miranda* rights. In the second video clip, the detectives questioned defendant about the shooting, defendant's gang affiliation, his friendship with Mays, and acquittance with Amanda Fitch.[4] Defendant told the detectives that he knew Anderson and heard younger members of the gang discuss his shooting. He told detectives that he did not hear Fitch was involved in the shooting, as she was "older" and older members of the gang did not speak with the younger members. Defendant stated that he had "never been" to the recording studio where Anderson was killed but knew where it was. In the third video clip, defendant stated that he knew Buchanan and

---

[3]The record does not provide the first names of Detectives Barnett and Felton.
[4]Amanda Fitch passed away shortly after Anderson's shooting, on November 14, 2013.

reiterated that he did not hear Fitch being involved in Anderson's murder. Towards the end of the third clip (referred herein as PX 4C), the detectives informed defendant that Mays and Buchanan were "locked up in the county," which they described as "being up here on the floor with us" and "[a]ll we do is call over there and say, *** we're comin' to get so and so and they make him available and we bring them up here to talk to 'em." The detectives told defendant that they spoke with Mays and Buchanan and "that's what prompted [them] to come and talk to [defendant]" regarding Anderson's murder.

¶ 17    The fourth video clip showed defendant admit to detectives that Mays, Fitch, and Buchanan were involved in the murder. On the day in question, defendant was at 51st Street and Prairie Avenue with Mays and Buchanan. Mays received a call that Anderson was at the recording studio making a song about them and Mays asked defendant whether he wanted to come with them to kill Anderson. Defendant said no. Mays and Buchanan drove away, with Buchanan in the passenger seat. Defendant learned that Fitch "went to trail them."

¶ 18    The fifth video clip showed defendant stating that he went with Mays and Buchanan in their car. They met Fitch at a gas station on 67th Street and Stony Avenue, where defendant "hopped in the car with [Fitch]." Defendant stated that he and Fitch were to be the "trail car" for Buchanan and Mays, meaning that their role was  to "[k]eep the police off 'em" and "[d]o some funny stuff" when "police get behind" so that they could get away. After they all drove to the recording studio, Buchanan and Mays drove into the alley while defendant and Fitch waited in their car on the street. Defendant knew they were going to shoot Anderson. Approximately 20 to 30 minutes later, defendant heard gunshots. They drove away and Fitch "dropped [defendant] off in Washington Park."

¶ 19    In the sixth video clip, detectives asked whether it was a correct statement that Mays wanted "[Fitch] to trail" and was "basically [saying] you're gonna be security while we go kill [Anderson]." Defendant's response was inaudible. The detectives again asked "[s]o you guys are going to be security for them, correct?" and defendant responded, "I guess." In the seventh video clip, defendant identified photographs of Mays, Buchanan, Fitch, and Anderson. In the eighth video clip, defendant indicated that Buchanan had the gun used in the shooting and that he saw the gun being loaded by Mays while riding in the car with them before they met up with Fitch. He told detectives that Mays had used a shirt while loading the gun to avoid leaving fingerprints. In the ninth video clip, defendant stated that Buchanan had the gun hidden in the car, retrieved it, and gave it to Mays. In the tenth video clip, defendant stated that he was not the shooter and was with Fitch.

¶ 20    On cross-examination, Detective Halloran testified that defendant denied being the shooter, did not see the shooting, and only admitted to riding in a trail car. There were no eyewitnesses who identified defendant as participating in the murder. Detective Halloran testified that the use of the word "security" by Detective Garza in one of the video clips was the first time it ever came up in the interview and that defendant never used that term. When asked if there was an inaudible response from defendant when Detective Garza asked him if he was going to act as "security," Detective Halloran responded that he did not "know if it was inaudible. I understood it. It's inaudible for the person who transcribed it." On redirect, Detective Halloran clarified that he understood defendant's "inaudible" response as an agreement with Detective Garza's use of the word "security" and testified that he would have inquired further had defendant disagreed or answered no. Detective Halloran acknowledged that a person could be involved in a murder in

more ways than just by pulling the trigger and that he had a responsibility to investigate every case to see who else may have been involved.

¶ 21    The parties stipulated that Diana Pratt, a forensic chemist with the Illinois State Police, would be qualified as an expert in firearms analysis and identification. The parties further stipulated that she received two fired cartridge cases and two fired bullets in connection to this case, and that her examination determined that the two fired bullets both came from the same firearm.

¶ 22    Dr. Benjamin Soriano, an assistant medical examiner with the Cook County Medical Examiner's Office, was qualified as an expert in the field of forensic pathology. He testified that he performed Anderson's autopsy and determined that Anderson had been shot twice, once in the right side of the back and once in the right thigh. Dr. Soriano recovered a single bullet from the skeletal muscle in the abdomen. He opined that the cause of Anderson's death was multiple gunshot wounds and that the manner was homicide. On cross examination, Dr. Soriano testified that Anderson's injuries would be consistent with someone that was shot from behind from more than 18 to 24 inches away.

¶ 23    Chicago police officer Derrick Scott testified that he was on patrol with his partner at 6:30 p.m. on the day in question when they responded to a call of a shooting in an alley near 70th and Stony Island. Upon his arrival, he saw Anderson on the ground and attempted to render aid. Officer Scott asked Anderson who shot him and Anderson responded that he did not know. Officer Scott stayed with Anderson until he was placed in an ambulance.

¶ 24    Chicago police officer John Heneghan testified that he was working as an evidence technician on the day in question. He arrived at the crime scene at around 7:10 p.m. The area was already secured by other officers. Officer Heneghan conferred with detectives on scene, took

photographs, and inventoried items of evidence, including two .45 caliber cartridges, a fired bullet, a blood swab, and a cell phone.

¶ 25    Detective Kristi Battalini testified that she was assigned to investigate Anderson's murder on September 26, 2013. On August 21, 2014, she interviewed defendant with Detective Garza around 4:37 p.m. Detective Battalini identified the State's Exhibit 4K as a recording of that interview. Our review of the video shows that defendant stated he was with Fitch during the commission of the murder, he decided to be a look out for Mays and Buchanan, acknowledged that he was "accountable," and stated that he was not the shooter.

¶ 26    On cross-examination, Detective Battalini testified that she stood near the door of the interview room, which was open, but denied that it was an interrogation technique. She further acknowledged that the words "accountable" and "look out" were words used by the detectives in the interview and not by defendant. On redirect, Detective Battalini clarified that the door to the interview room was left open at defendant's request and that defendant never indicated that he was uncomfortable. Detective Battalini also clarified that defendant appeared to understand the terms "accountable" and "look out" and never showed any confusion.

¶ 27    Detective John Murray testified that he was investigating Anderson's murder along with other detectives on August 22, 2014. He encountered defendant at around 11:40 a.m. at the police station. Defendant was placed in an interview room and Detective Murray brought Mays to the restroom across the hall, about "4, 5 feet away" from the interview room. After Mays entered the restroom, Detective Murray closed the door and locked it. As he started to leave, defendant expressed an interest in using the restroom. Detective Murray informed defendant he could use it after Mays and then returned to the detectives' workstation area to give Mays some privacy while he was in the restroom. He could not hear what was going on from the workstation. He testified

that defendant's interview room was still recording with its equipped audio and video equipment and captured what occurred in defendant's interview room while Mays was using the restroom. The State introduced a video clip (referred herein as PX 15), which showed defendant lying next to the door speaking with Mays while he is in the restroom. Defendant suggested to Mays that they work together and should "blame it" on Buchanan.

¶ 28    The State rested.

¶ 29    Defendant moved for a directed finding, which the court denied. Defendant elected not to testify and rested his case without presenting any witnesses. The State and defense gave closing arguments, and the trial court instructed the jury.

¶ 30    During jury instructions, the trial court informed the jury that defendant was presumed innocent throughout every stage of the trial, and that "[t]he fact that the defendant did not testify must not be considered by [the jury] in any way in arriving at [the] verdict." During deliberations, the jury sent out a note asking, "How do we determine what's best way to define 'one for whose conduct he is legally responsible?' " Jurors were referred back to the instructions and were not given any additional instructions. The jury found defendant guilty of first-degree murder on an accountability theory, and that defendant or someone for whom he was legally responsible was armed with a firearm during the commission of the offense.

¶ 31    Defense counsel filed a motion for a new trial, arguing, *inter alia*, that defendant was denied a fair trial when video clips showing that a codefendant implicated him were admitted. The motion was denied. Trial counsel then withdrew, and defendant appointed a public defender.

¶ 32                                    D. Sentencing

¶ 33    At the sentencing hearing, the trial court heard victim impact statements from Anderson's uncle and mother. The State and defense argued factors in aggravation and mitigation. The trial

court considered various factors such as defendant's age, maturity, background, degree of participation in the homicide, any incompetence, and rehabilitative nature. In summarizing the facts of the case, the court noted that Anderson came out with a cell phone in hand and was shot. The court considered defendant's age of 17 years and acknowledged that there were "studies ** in regards to the lack of development in the cerebral area for 17 year olds." However, the court noted that "some 17-year-olds have much more experience in life than others" and defendant was one of them. In considering defendant's level of maturity, the court found that defendant was mature based on "how [the offense] was planned out, how he planned to have a story with his co-defendant on who to blame, on his conduct." The court further noted that defendant represented himself here and drafted motions. The court stated that defendant was "given probation as a juvenile and he was even then not even completing that successfully."

¶ 34    The court found that defendant's "degree of participation [in the offense was] 100 from the very inception of where they were on the street and where Anderson was." With regards to the "discretionary nature in the enhancement," the court stated that it looked at defendant's prior background. In describing defendant's rehabilitative nature, the court found it "very questionable, given [defendant's] continuation to subvert truth-seeking, either by officers and by colluding with the co-defendant on how to shift blame." According to the court "[t]he complete planning of this execution from beginning to end does not indicate a novice or someone that is young or someone that doesn't contemplate." Taking all these factors into consideration, the court applied a 15-year enhancement. The court then sentenced defendant to 45 years for first-degree murder on an accountability theory, plus a 15-year enhancement based on the jury's finding that defendant or someone for whom he was legally responsible was armed with a firearm during the commission

of the offense, for a total of 60 years in prison. Defendant moved to reconsider the sentence, which the court denied.

¶ 35    This appeal followed.

¶ 36                                    II. ANALYSIS

¶ 37    On appeal, defendant argues that this court should reverse his conviction and remand for a new trial because (1) his sixth amendment right to confrontation and his right to a fair trial were violated when the trial court permitted the jury to hear two non-testifying codefendants implicate him to the police; (2) defense counsel was ineffective for not moving to suppress the conversation between him and codefendant Michael Mays which was recorded in violation of the laws against eavesdropping; (3) the trial court violated Illinois Supreme Court Rule 431(b) by failing to ask if the jurors understood and accepted that defendant had no obligation to testify, and that his failure to testify could not be held against him; and (4) defense counsel was ineffective for allowing a juror, who admitted during *voir dire* that there was something that would prevent him from being a fair and impartial juror, from sitting on the jury without further investigation.

¶ 38    Defendant further requests that this court remand for a new sentencing hearing because his 60-year sentence constitutes a *de facto* life sentence that violates the eighth amendment and proportionate penalties clause. Alternatively, defendant requests this court to remand for resentencing because counsel was ineffective for not developing and presenting a disparate sentencing argument.

¶ 39                                    A. Sixth Amendment

¶ 40    Defendant argues that the trial court violated his sixth amendment right to confrontation, as set out in *Bruton v. U.S.*, 391 U.S. 123, 136 (1968), by permitting the jury to hear that his codefendants implicated him in statements to police. Specifically, defendant argues that the trial

court erred in allowing two recordings: (1) the PX 4C recording of defendant's interrogation where the detectives said that speaking with the codefendants led them to talk to defendant; and (2) the PX 15 recording of a conversation between defendant and Mays where defendant told him that the detectives disclosed that Mays implicated him in the crime. Defendant contends that the State's case was not strong as it could not prove defendant was the shooter, or even that defendant was in the company of his codefendants Mays and Buchanan, when they drove to the scene of the crime. As such, evidence that both Mays and Buchanan implicated him was extremely prejudicial and cannot be deemed harmless beyond a reasonable doubt.

¶ 41     In contrast, the State contends that the statement that detectives talked to the codefendants was not a *Bruton* violation because the "police did not recount the substance of any conversation and the exchange was admissible [to] explain the progress of the police investigation." The State argues that the second clip also does not implicate *Bruton* because it is defendant's own statement offered against him. Further, in rejecting defendant's argument that "any error was not harmless," the State asserts that there is "no probability that defendant would have been acquitted but for the inclusion of the disputed video clips, as defendant describes [his] participation in the victim's murder in [the other] video clips."

¶ 42     The sixth amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. This is known as the confrontation clause and applies to the states through the fourteenth amendment. *People v. Stechly*, 225 Ill. 2d 246 (2007). The right to confrontation protects the defendant from testimonial hearsay. *Davis v. Washington*, 547 U.S. 813, 823-24 (2006). Hearsay is a statement, other than one made by the declarant while testifying at trial, offered into evidence to prove the truth of the matter asserted. *People v. Leach*, 2012 IL

111534, ¶ 66 (citing Ill. R. Evid. 801(c) (eff. Jan. 1, 2011)). A defendant is denied his sixth amendment right to confrontation when a codefendant's hearsay admission is admitted against him and the codefendant does not testify. *People v. Thomas*, 116 Ill. 2d 290, 301 (1987).

¶ 43    However, statements by a police officer used to explain the investigatory process are not offered to prove the truth of the matter asserted and therefore, are not hearsay. *People v. Armstead*, 322 Ill. App. 3d 1, 12 (2001). This is because allowing police officers to explain their investigatory conduct prevents them from being "put in the false position of seeming just to have happened upon the scene" and upon the defendant. *People v. Cameron*, 189 Ill. App. 3d 998, 1004 (1989) (quoting McCormick, Evidence § 249 at 734 (3d ed. 1984)). Under the investigatory process exception, a police officer may recount the steps of his investigation into the crime and describe the events that led to the defendant's arrest where such testimony is necessary and crucial to explain the State's case to the trier of fact. *People v. Simms*, 143 Ill. 2d at 174.

¶ 44    Here, defendant argues that admission of the PX 4C recording violated his sixth amendment right to confrontation, as set out in *Bruton v. U.S.*, 391 U.S. 123, 136 (1968). In *Bruton*, the defendant was jointly tried for armed robbery with a codefendant who did not testify. *Bruton*, 391 U.S. at 124-28. At trial, a postal inspector testified that the codefendant had confessed to him that he and the defendant had committed the crime. *Id.* at 124. The trial court instructed the jury to consider the testimony regarding the codefendant's confession as evidence only against that codefendant, and that it was inadmissible hearsay as to the defendant and should be disregarded. *Id.* at 125. On appeal, the Supreme Court reversed the defendant's conviction, finding that the admission of the codefendant's statement violated defendant's right to confrontation, and that the limiting instruction was not "an adequate substitute for [defendant's] constitutional right of cross-examination." *Id.* at 136-37.

¶ 45    Unlike *Bruton*, defendant here was not jointly tried with his codefendants. Additionally, though the testimony at issue in *Bruton* explicitly informed the jury that the codefendant implicated the defendant in the crime, the recording here only informed the jury that detectives spoke with Mays and Buchanan and then decided to speak with defendant. Thus, *Bruton* is distinguishable.

¶ 46    Further, we find defendant's reliance on *People v. Ochoa*, 2017 IL App (1st) 140204, to be misplaced. In *Ochoa*, the State repeatedly elicited testimony from one of the detectives about the substance of his conversation with a non-testifying codefendant (*e.g.*, that he "obtained information of two additional offenders"). *Id.* ¶ 50. Testimony by another detective revealed that he was "with co-defendants *** at the police station, [when he] discovered the defendant's home address, nickname, gender, ethnicity, height and build, and information about his tattoo." *Id.* ¶ 51. Further, during closing arguments, the State stated that the defendant "knew three co-defendants were in custody at that station. He knew the police had solved this crime. And you know what? He knew at that point there was no reason to deny it. *** started talking immediately." *Id.* ¶ 54.

¶ 47    This court held the detectives' testimony was inadmissible hearsay where there was a strong inference that codefendants implicated the defendant in the crime. *Ochoa*, 2017 IL App (1st) 140204, ¶ 52. The court noted that "a police officer may testify about a conversation that he had with an individual and his actions pursuant to the conversation to recount the steps taken in his investigation of the crime." *Id.* ¶ 41. However, testimony offered for this purpose must be limited in scope, and "the police officer may not testify to information beyond what was necessary to explain the officer's actions." *Id.* The court found that the State's evidence did not simply relay the investigatory steps to the jury but rather, led the jury to draw the inference that the codefendants had implicated defendant in the crime. *Id.* ¶ 53.

¶ 48 Here, the PX 4C contained an out-of-court statement in which Detective Halloran stated he was "prompted" to talk to defendant after speaking to codefendants who were already in custody. The exchange here did not reveal the content or recount the substance of the conversation with codefendants. There was no inference that codefendants were implicating defendant in the murder.

¶ 49 Unlike *Ochoa,* where the detective testified that he received information of "two additional offenders" after dealing with codefendants, Detective Halloran only testified that he spoke with Mays at the police station and that at some point, he made efforts to locate defendant. Further, at trial, the State's closing argument also did not emphasize this recording. *Ochoa* is distinguishable because the recording and testimony here did not create a strong inference that codefendants implicated defendant in the crime and did not go beyond the limited purpose of showing investigation of the murder in this case. Thus, we find no sixth amendment violation in the admission of PX 4C.

¶ 50 Turning to the admission of the PX 15 recording, we find that the recording revealed the defendant's own words. The only audible statements in the PX 15 recording were that of defendant. May's statements were inaudible. The confrontation clause is implicated where statements from a non-testifying codefendant are admitted. As such, the admission of the PX 15 recording did not violate the confrontation clause.

¶ 51 Even assuming, *arguendo*, that the trial court erroneously admitted the disputed clips, we find that the error was harmless. When a trial error affects a constitutional right, it is reversible error unless it is harmless beyond a reasonable doubt. *People v. MacFarland*, 228 Ill. App. 3d 107, 121 (1992). In determining whether the error was harmless, the weight of the evidence proving the defendant's guilt must be considered. *Id*. If the evidence of defendant's guilt is uncontroverted or

so overwhelming that the constitutional violation did not have an effect on the verdict, then the error is harmless beyond a reasonable doubt. *Id.*

¶ 52 Here, the disputed recordings were not the primary evidence linking defendant to the crime. The jury was shown different video clips where defendant described and confessed to his participation in the offense. Defendant stated that he knew that codefendants intended to shoot Anderson, that he was a passenger in the "trail car" designed to insulate the shooter from the police, and that he agreed to be a look out. We note that a "confession is the most powerful piece of evidence the State can offer." *People v. R.C.*, 108 Ill. 2d 349, 356 (1985). We agree with the State that the strength of defendant's confession is not diminished because his role in the murder was less involved. See *People v. Philips*, 2014 IL App (4th) 120695 (providing that a defendant is accountable for codefendants' acts where defendant acts with the intent to facilitate the underlying offense).

¶ 53 Unlike *Ochoa,* where this court noted that the jury could have found the defendant not guilty because the "only evidence linking defendant to the crime, [other than the improper hearsay evidence], was his troubling foreign-language confession made with no official translator," the record here does not suggest anything "troubling" as to defendant's confession. See *Ochoa*, 2017 IL App (1st) 140204, ¶ 59. Our review of the record shows that defendant understood detectives' questions, answered accordingly, and his confession was voluntary. Thus, defendant's confession is extremely persuasive of his guilt. See *People v. Clay*, 349 Ill. App. 3d 24, 30 (2004) (stating that "confessions frequently constitute the most persuasive evidence against a defendant"). Therefore, any error was harmless. Thus, we find no sixth amendment violation in the admission of PX 15.

¶ 54                                  B. Eavesdropping Statute

¶ 55     Defendant next contends that his trial counsel was ineffective for failing to suppress the PX 15 recording of his conversation with Mays while he was in the restroom next to the interrogation room. Defendant argues that this clip was inadmissible because it was recorded in violation of sections 108A and 108B of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/108A-1, *et seq.* (West 2014) ; 725 ILCS 5/108B-1, *et seq.* (West 2014)).

¶ 56     We review ineffective assistance of counsel claims under the standard set forth in *Strickland v. Washington*, 466 U.S. 688 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show: (1) counsel's performance was objectively unreasonable under prevailing professional norms and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *People v. Hale*, 2013 IL 113140, ¶ 18. The failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *People v. Patterson*, 192 Ill. 2d 93, 107 (2000).

¶ 57     Article 108A of the Code governs judicial supervision of the use of eavesdropping devices. 725 ILCS 5/108A-1, *et seq.* (West 2014). Article 108B governs electronic criminal surveillance. 725 ILCS 5/108B-1, *et seq.* (West 2014). The use of an eavesdropping device "does not constitute a violation of [the eavesdropping statute when it] is done in accordance with Article 108A or Article 108B of the [Code]." However, an aggrieved party may file a motion to suppress any conversation that was recorded or intercepted in violation of the eavesdropping statute. See 725 ILCS 5/108A-9(a), 108B-12(c) (West 2014); see also *People v. Coleman*, 227 Ill.2d 426, 435 (2008).

¶ 58    The State argues that defendant's interview took place in August 2014 and "[t]o the extent that defendant's argument is premised on the [eavesdropping statute], *** that statute did not become law until December 30, 2014." Because defendant's brief does not cite to the former version of the statute, the State contends that "defendant cannot establish that counsel was unreasonably deficient [under the first *Strickland* prong] where a significant basis for [defendant's] argument is a law that does not apply to the conduct at issue."

¶ 59    To the extent that the eavesdropping statute can be said to be applicable here, we note that we are required to apply the version of the statute in effect at the time the recording was made. See *People v. Rodriguez*, 313 Ill. App.3d 877, 886-87, *appeal denied*, 191 Ill. 2d 553 (2000). Prior to 2014, the eavesdropping act prohibited an individual from knowingly and intentionally recording any conversation between two or more people without the consent of all parties to the conversation. 720 Ill. Comp. Stat. 5/14-2 (2012). However, in March 2014, our supreme court in *People v. Clark*, 2014 IL 115776 (2014) and *People v. Melongo*, 2014 IL 114852 (2014) held that the portion of the eavesdropping statute that required two-party consent to record a conversation was unconstitutionally overbroad as it had the effect of criminalizing recording of conversations that were not private. 720 ILCS 5/14-2(a-5) (West 2014).

¶ 60    Following our supreme court's decisions in *Clark* and *Melongo*, the legislature amended the statute in December 2014 to include communications where one or more parties is reasonably justified in expecting the conversation to be private. The eavesdropping statute, amended on December 30, 2014, provides that "a person commits eavesdropping when he or she knowingly and intentionally *** [u]ses an eavesdropping device, in a surreptitious manner, for the purpose of overhearing, transmitting, or recording all or any part of any private conversation to which he or she is not party unless he or she does so with the consent of all the parties to the private

conversation." 720 ILCS 5/14-2(a)(1) (West 2014). "Private conversation" is defined as "any oral communication between 2 or more persons, whether in person or transmitted between the parties by wire or other means, when one or more of the parties intended the communication to be of a private nature under circumstances reasonably justifying that expectation." 720 ILCS 5/14-1(d) (West 2014). A reasonable expectation "include[s] any expectation recognized by law, including, but not limited to, an expectation derived from a privilege, immunity, or right established by common law, Supreme Court rule, or the Illinois or United States Constitution." *Id.*

¶ 61    Defendant asserts that "[a]t all times, *** this statute has made it a crime to record a private conversation to which one is not a party." As such, recordings of private conversations, such as the one at issue here, was prohibited under both the 2014 version and the prior 1994 version of the statute. Given that private communications have been subject to protection under the various versions of the eavesdropping statute, we reject the State's argument that "defendant cannot establish that counsel was unreasonably deficient" under the first *Strickland* prong because defendant's brief does not cite to the former version of the statute. We now proceed to address the merits of defendant's arguments.

¶ 62    Defendant argues that the authorization procedures set forth in sections 108A and 108B were not utilized and therefore, warrants a suppression of the PX 15 recording which was procured in violation of these procedures. We find that defendant's claim fails at the outset because he had no reasonable expectation of privacy in his communication with Mays at the police station. The eavesdropping statute and Code protect conversations where the parties have an expectation that the communication is private and not subject to interception. See 720 ILCS 5/14-1(d) (West 2012); see also 725 ILCS 5/108B-1(o) (West 2014). In *Melongo*, our supreme court provided examples of conduct that could not be deemed private, such as "loud argument on street, yelling fans at

athletic event, or conversation loud enough that speakers would expect to be heard by others." *Melongo*, 2014 IL 114852, ¶ 29.

¶ 63    Defendant disagrees with the State's contention that the conversation between defendant and Mays was not private because it could be overheard. Here, the recording at issue was captured while defendant was at the police station for interrogation. Detective Murray's testimony revealed that defendant was placed in an interview room while Mays was in a restroom located across the hall, about 4 or 5 feet away. After Mays entered the restroom, Detective Murray closed the door and locked it. Defendant was also behind closed doors of the interview room. We agree with the State that there is no reasonable expectation of privacy where such a conversation would be subject to interception. Although Mays and defendant may have intended their conversation to not be heard, they could still expect that their conversation would be intercepted based on the place and manner where the exchange took place. Because defendant did not have a reasonable expectation of privacy as to the PX 15 recording, we cannot say that trial counsel's performance, in failing to suppress the recording on the basis that it violated the eavesdropping statute and the Code, was objectively unreasonable. Thus, defendant's ineffective assistance claim fails *Strickland's* first prong.

¶ 64    Defendant's claim also fails under the second *Strickland* prong. Defendant has not shown a reasonable probability that the outcome of the trial would have been different but for the alleged failure of his counsel to suppress defendant's recording with Mays. As previously mentioned, defendant's conviction arose from his recorded confession in other clips, wherein he admitted participating in the crime. Additionally, we note that defendant's confession included details of the crime which corresponded to the evidence and testimony presented at trial. For instance, defendant's confession providing the location of the shooting was corroborated by the testimony

of the detectives at trial. Defendant also noted that he heard about two gunshots which was consistent with the expert testimony of two fired bullets. Therefore, defendant's claim of ineffective assistance of counsel must fail.

¶ 65                           C. Rule 431(b) Admonishment

¶ 66    Defendant contends that he is entitled to a new trial because the trial court failed to properly admonish the potential jurors as required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), commonly referred to as the four *Zehr* principles (see *People v. Zehr*, 103 Ill. 2d at 469). Specifically, defendant argues that the court failed to ask the prospective jurors whether they both understood and accepted that defendant had no obligation to testify and that his failure to testify could not be held against him. The State contends that the conviction should be affirmed because defendant failed to preserve the issue for appellate review. The State further asserts that defendant cannot "meet the burden for reversal under the plain error doctrine because the simple non-compliance with Rule 431(b) does not necessarily constitute reversible error, and [he] cannot establish prejudice under either prong of the plain-error doctrine."

¶ 67    As a preliminary matter, we note that defendant has failed to raise the issue below. Generally, "a defendant must object to the alleged error when it occurs and raise the issue in a posttrial motion" to preserve an issue for review. *People v. Phagan*, 2019 IL App (1st) 153031, ¶ 76 (2019) (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). Because defendant has failed to preserve this issue, he requests that we review the issue under the plain-error doctrine. Illinois Supreme Court Rule 615(a) provides, in part, that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a). As such, the plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error. *People v. Fort*, 2017 IL 118966, ¶ 18. Accordingly,

we will review the merits of defendant's argument under the plain-error doctrine despite his failure to preserve the objection at trial.

¶ 68    In a plain-error analysis, we must first "determine whether a clear or obvious error has occurred." *People v. Darr*, 2018 IL App (3d) 150562, ¶ 47 (citing *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). This requires us to give a "substantive look" at the issues raised. *People v. Johnson*, 208 Ill. 2d 53, 64 (2003). Absent an error, there can be no plain error and we must honor the procedural bar. *People v. Eppinger*, 2013 IL 114121, ¶ 19. However, if we determine that a clear or obvious error has occurred, the defendant then bears the burden of demonstrating that the error was prejudicial. *Darr*, 2018 IL App (3d) 150562, ¶ 48. The defendant may demonstrate prejudice by showing that either: (1) the evidence at trial was so closely balanced that the guilty verdict may have resulted from the error; or (2) the error was so serious that it deprived the defendant of a fair trial. *People v. McLaurin*, 234 Ill. 2d 478, 489 (2009).

¶ 69    Rule 431(b) requires the court to "ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. Sup. Ct. R. 431(b). Defendant does not dispute that the court advised the jurors of the first three principles. Defendant only contends that the trial court failed to address the fourth principle. We would point out that prior to jury deliberations, the court instructed the jury that "the fact that the defendant did not testify must not be considered by [the jury' in any way in arriving at [the] verdict." Even so, the record supports defendant's contention that during jury selection, the court did not admonish the jurors that defendant's failure to testify

cannot be held against him. As such, the court's failure to inform the jurors of the fourth principle was clear error.

¶ 70    Nevertheless, citing *People v. McGee*, 398 Ill. App. 3d 789, 794 (2010), the State  argues that there can be no plain error without reversible error. Citing to our supreme court decision in *People v. Glasper*, 234 Ill. 2d 173, 181 (2009) and its subsequent decision in *People v. Thompson*, 238 Ill. 2d 59 (2010), the State contends that "[w]hile the failure to ask all four *Zehr* questions might constitute a violation of Rule 431(b), the [trial] court's failure to comply with Rule 431(b) does not automatically compel reversal." We agree.

¶ 71    In *Glasper*, the issue before our supreme court was whether the trial court's failure to comply with a pre-amended version of Rule 431(b) required automatic reversal of the defendant's conviction. *Glasper*, 234 Ill. 2d at 189. Our supreme court noted that automatic reversal is required only when an error is "structural." *Id.* at 197. An error is deemed structural if it renders a criminal trial fundamentally unfair or an unreliable means of assessing guilt or innocence. *Id.* at 197-98. The court found that failure to comply with Rule 431(b)(4) did not involve a fundamental right but rather, the error only involved a violation of a supreme court rule which does not warrant reversal in every instance. *Id.* In *Thompson*, the supreme court applied the reasoning of *Glasper* to the amended Rule 431(b), finding that "although compliance with Rule 431(b) is important **** [it] does not require automatic reversal of defendant's conviction." *Thompson*, 238 Ill. 2d 598 (2010). As such, we agree with the State and highlight the general rule that violations of Rule 431(b) may constitute error but does not warrant automatic reversal. The relevant inquiry is whether, as a result of the violation, defendant suffered any prejudice.

¶ 72    Accordingly, having found clear error, we return to our analysis of whether defendant has met his burden of demonstrating that the error was prejudicial under the plain-error doctrine.

Defendant acknowledges that only the first prong of the plain-error doctrine applies. See *People v. Sebby*, 2017 IL 119445 (stating that a "Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury.") As such, we analyze defendant's claim of prejudice under the first prong.

¶ 73    "Where the defendant claims first-prong plain error, a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Id.* ¶ 53. Our inquiry "involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.*

¶ 74    In the present case, defendant was charged with first-degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) based on the theory of accountability. A defendant commits first-degree murder when he kills an individual without lawful justification and "either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another." 720 ILCS 5/9-1(a)(1) (West 2014). A defendant is legally accountable for the conduct of another when, "either before or during the commission of an offense, and with the intent to promote or facilitate its commission, he solicits, aids, abets, agrees, or attempts to aid the other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2014). Mere presence or presence with knowledge that a crime will be committed is not enough. *People v. Velez*, 388 Ill. App. 3d 493, 512 (2009).

¶ 75    Here, defendant's confession shows that he agreed or attempted to aid in Anderson's murder. Defendant confessed that Mays had asked him to shoot Anderson. Although defendant

rejected the invitation to shoot him, he agreed to serve as a look out for Mays and Buchanan with the knowledge that they intended to kill Anderson. Defendant was not merely present at the scene with the knowledge that the shooting would occur, but rather his confession revealed that he was in a trail car for purposes of "[k]eep[ing] the police off 'em" so that they could get away. Defendant further provided details of the shooting such as the location of the crime and approximately how many shots were fired which was corroborated by the testimony presented by the State. This lends support to the credibility of defendant's confession. Defendant cannot show that the evidence was closely balanced and therefore, the court's failure to instruct the jurors was not prejudicial as there was evidence of defendant's guilt (*e.g.,* confession recordings). In sum, we find that, although the trial court's failure to instruct the jurors of the fourth principle constituted clear error, it was not plain error, and thus, we honor the procedural bar.

¶ 76                                    D. Fair and Impartial Juror

¶ 77    Defendant asserts that he was denied his right to the effective assistance of counsel when his counsel failed to inquire further as to why Carter, one of the prospective jurors, believed his relationship with certain lawyers would prevent him from being fair and impartial. The State, on the other hand, contends that Carter's "expression of bias was far from unequivocal where he also indicated he could be fair and impartial throughout the trial." Again, we note that to prevail on a claim of ineffective assistance of counsel, a defendant must show: (1) counsel's performance was objectively unreasonable under prevailing professional norms and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Patterson*, 192 Ill. 2d at 107. We agree that Carter's expression of bias was far from unequivocal where he indicated he could be fair and

impartial throughout the trial. Specifically, Carter acknowledged that he would "give each witness that testifies the same weight and level of credibility regardless of what they do for a living" and that he would "listen to all the evidence and do so in a fair and impartial manner." As such, trial counsel's performance, in failing to inquire further, was not objectively unreasonable. Thus, defendant's claim of ineffective assistance of counsel on this issue is without merit.

¶ 78                                    E. *De Facto* Life Sentence

¶ 79    Defendant argues his *de facto* 60-year life sentence was improper because  the trial court appeared to rely on evidence outside the record or not in existence. Defendant further contends that his sentence violated the eight amendment of the United States Constitution where the trial court (1) did not adequately consider his youth and its attendant characteristics; and (2) failed to find that defendant's "conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." Defendant also contends that his sentence violated the proportionate penalties clause of the Illinois Constitution and that trial counsel was ineffective for not developing a disparate sentencing claim where Mays, 21 at the time of the crime, was given only a 24-year sentence for conduct identical to that of defendant, who was 17 years old. As such, defendant requests this court to remand for resentencing.

¶ 80    The State concedes that defendant is entitled to a new sentencing hearing on the basis that the trial court considered facts not in evidence when sentencing defendant. In his reply brief, defendant, without waiving his other sentencing claims, notes that the State has conceded that resentencing is required where the trial court considered facts not in evidence. Although the State concedes that the case should be remanded for resentencing, we are not bound by party concessions (e.g., *People v. Carter*, 2015 IL 117709, ¶ 22). Thus, we proceed to address the issue on the merits.

¶ 81 We first address defendant's argument, as stated in his opening brief, that the court considered improper factors or evidence not in the record. Defendant points out that throughout sentencing, the trial court made repeated references to a phone call made to Anderson. The court stated that "Anderson comes out, and while he is on the phone is shot, executed." The court also commented that "miraculously, when they arrive there's a phone call and he came out. There's no indication that any of them did that, but somehow at the right time that all those cars arrive [Anderson] does come out." Defendant argues, and the State concedes, that there was no evidence presented in this case that Anderson received a phone call before he was shot or that he had just come out of the studio. According to the State, the trial court may have "improperly gleaned these facts from the evidence introduced at the co-defendants' separate trials." The State contends that the court's "consideration of facts only introduced at co-defendants' severed trials in aggravation against defendant requires a new sentencing hearing." We agree.

¶ 82 Generally, "[a] trial court has wide latitude in sentencing a defendant, so long as it neither ignores relevant mitigating factors nor considers improper factors in aggravation." *People v. Roberts*, 338 Ill. App. 3d 245, 251 (2003). "Where the sentencing judge relies on improper factors, including prejudice or speculation, the sentence should be vacated, and the cause remanded for resentencing." *People v. Zapata*, 347 Ill. App. 3d 956, 964 (2004). However, a "remark made in passing is not prejudicial to a defendant so that a new sentencing hearing is required." *People v. Hayden*, 338 Ill. App. 3d 298, 308 (2003).

¶ 83 Here, the court's statements regarding the cell phone are not supported by the record. Further, the comments were not merely in passing. Rather, the court repeatedly referred to the fact that the victim received a call and while on the phone, he was shot. It appears that the court considered this fact in aggravation and assessing the seriousness of the crime. The circuit court's

discussion of Anderson receiving a phone call, coming out of the studio, the "miraculous" timing of the call, and then being "executed" indicates that the court considered the phone call to be a fact in aggravation. Because the trial court relied on improper factors not supported by the record, we vacate the sentence and remand for resentencing.

¶ 84     Because we must remand the cause for resentencing, we need not address defendant's ineffective assistance claims regarding sentencing. However, as certain issues regarding the court's consideration of aggravation and mitigation may arise again at resentencing, we find it prudent to briefly discuss defendant's claimed constitutional deficiencies here, so as to provide guidance.

¶ 85     Defendant on appeal has argued that a resentencing is warranted where his 60-year sentence violated the eight amendment. The eighth amendment prohibits "cruel and unusual punishments" and is applicable to the states through the fourteenth amendment. U.S. Const. amend. VIII; *People v. Davis*, 2014 IL 115595, ¶ 18. The United States Supreme Court addressed the effect of the eighth amendment on juvenile sentences in *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny. In *Miller*, the Court held that the eighth amendment is violated where a mandatory life sentence without parole is imposed upon a juvenile without consideration of the defendant's youth and its attendant characteristics. *Id.* at 479-80. Consistent with *Miller*, sentencing courts in homicide cases are required to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480. The Court later held that *Miller* applied retroactively to collateral review cases (*Montgomery v. Louisiana*, 575 U.S. 911 (2016)), and our supreme court has determined that *Miller* applies to juvenile life sentences whether natural or *de facto* (*People v. Reyes*, 2016 IL 119271, ¶ 9), or whether mandatory or discretionary (*People v. Holman*, 2017 IL 120655, ¶ 40).

In Illinois, a sentence of 40 years or more for a juvenile offender is considered a *de facto* life sentence. *People v. Buffer*, 2019 IL 122327, ¶ 40.

¶ 86    Although *Miller* changed the landscape for juvenile sentencing, it did not preclude the possibility of life sentence for a juvenile offender. A juvenile offender may receive a life sentence "but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. However, before a trial court may make this determination, the court must consider the defendant's youth and its attendant characteristics, commonly known as the *Miller* factors. *Id.*  These characteristics, include, but are not limited to:

> "(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46 (citing *Miller*, 567 U.S. at 477-78).

¶ 87    To prevail on a claim based on *Miller*, the juvenile defendant must show that the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and that the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence. *Buffer*, 2019 IL 122327, ¶ 27. Here, the record shows that defendant's sentence was discretionary and there is no dispute that defendant, who was 17 years old at the time of the offense, received a 60-year sentence which constitutes a *de facto* life sentence under *Buffer*. Defendant claims that the

trial court did not adequately consider the relevant factors. First, defendant argues that the court "did not consider any of the factors" in imposing the *de facto* life sentence and instead, only discussed "factors related to youth in determining whether to impose a 15-year firearm enhancement." Second, defendant claims that the court failed to apply those factors correctly as the "court repeatedly relied on [defendant's] behavior as an adult to find that he was a mature 17-year-old."

¶ 88    Based on our review of the record, it is apparent that the trial court considered the *Miller* factors in imposing the 15-year firearm enhancement. The court considered defendant's age, maturity, background, degree of participation in the homicide, any incompetence, and rehabilitative nature. The court explicitly noted that it "[took] all these factors into consideration" in deciding to impose a 15-year enhancement. However, we agree with defendant that it is not entirely clear that the court considered those same factors when sentencing defendant for the underlying murder conviction as the court did not explicitly restate them. Nevertheless, prior to the consideration of the factors, defense counsel had stated it had or "it was the same argument" as to both sentencing for the conviction and enhancement. This suggests, to a degree, that the court may have applied the factors as to both enhancement and sentencing on the murder conviction. To be clear, we know of no requirement that the court must parse out and restate on the record its consideration of these factors for each component of a defendant's sentence. However, in the interest of clarity, we suggest that the court state for the record which aspects of the sentencing the factors have been considered.

¶ 89    Next, defendant argues that the trial court did not adequately consider the *Miller factors* with respect to: (1) his role in the offense; (2) level of maturity and evidence of rehabilitation; (3) peer pressure; (4) juvenile history; and (5) home environment and social/educational background.

As our supreme court noted, a juvenile defendant may be sentenced to life or *de facto life* imprisonment, but prior to doing so, the trial court must consider the defendant's youth and attendant factors as noted in *Miller*. *Buffer*, 2019 IL 122327, ¶ 19. We cannot say that the court did so here where the record does not reflect whether certain *Miller* factors, like defendant's family and home environment were considered. As such, to the extent that they may have been overlooked, we invite the court's consideration on remand.

¶ 90                                      III. CONCLUSION

¶ 91    For the reasons stated, we affirm defendant's conviction, vacate the sentence, and remand the cause for resentencing consistent with this decision.

¶ 92    Affirmed in part and vacated in part; and cause remanded for resentencing.